Ryan J. Lorenz – #8165
**CLARK HILL PLC**
14850 N. Scottsdale Road, Suite 500
Scottsdale, Arizona 85254
Telephone: (480) 684-1100
Facsimile: (480) 684-1167
Email: rlorenz@clarkhill.com

*Attorneys for Plaintiff Alpine 4 Technologies, Ltd.*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Alpine 4 Technologies, Ltd., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>Alan W. Martin; Jason Huffacker; Donald G. Belcher,<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT** |

Plaintiff Alpine 4 Technologies, Ltd. ("Alpine 4"), through counsel, for its complaint, alleges as follows:

1. Alpine 4 is a Delaware corporation which is headquartered in and operates in Phoenix, Arizona.

2. Defendants Alan W. Martin, Jason Huffacker and Donald G. Belcher are residents of the State of Oklahoma and have caused events to occur damaging Alpine 4 in Arizona. Defendant Martin is a party to an agreement with Alpine 4 to be performed in Arizona and under which jurisdiction is vested in state and federal courts sitting in Maricopa County, Arizona.

3. Alpine 4 and Defendants are citizens of different states for purposes of determining subject matter jurisdiction of federal courts based upon diversity.

4. The amount in controversy in this action exceeds $75,000.

5. This court has personal jurisdiction over the Defendants and subject matter jurisdiction over the claims on the basis of diversity of citizenship.

6. Venue is proper in this district under the provisions of an agreement which includes a forum selection clause designating state and federal courts sitting in Maricopa County, Arizona, as the proper jurisdiction and venue for the claims to be heard.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

7. Alpine 4 is a publicly traded corporation engaged in various business permitted under its organizational documents.

8. In or about October 2016, Alpine 4 began to negotiate, formulate, and finalize terms under which Alpine 4 would purchase Horizon Well Testing, L.L.C., an Oklahoma limited liability company ("HWT") from Defendant Martin, its one hundred percent (100%) owner/member/manager.

9. HWT provided oil, fracking and related industry support services.

10. As part of the negotiations between Alpine 4 and Defendant Martin, Defendant Martin identified Defendant Huffacker as a key employee, who oversaw all of HWT's water transfer services, logistics, and implementation. A copy of an email dated October 17, 2016 from Defendant Martin to Alpine 4 identifying Defendant Huffacker as such is attached as Exhibit 1 and is incorporated by reference.

11. Based upon due diligence and Defendant Martin's assurance that HWT was valuable as a going concern and would remain valuable if purchased and owned by Alpine 4, on October 13, 2016, Alpine 4 and Defendant Martin executed a letter of intent framing the terms of a possible agreement for the sale of HWT to Alpine 4. A copy of the letter of intent is attached as Exhibit 2 and is incorporated by reference.

12. On November 30, 2016, Alpine 4 and Defendant Martin executed a Securities Purchase Agreement under which Alpine 4 agreed to purchase and

Defendant Martin agreed to sell HWT under terms and conditions specified in the same ("Contract"). A copy of the Contract is attached as Exhibit 3 and is incorporated by reference.

13. Under the Contract, Defendant Martin made warranties and representations concerning HWT's financial statements.

14. Defendant Martin represented that the balance sheets of HWT for 2012 to 2015 represented an accurate portrayal of HWT's financial condition. Specifically, Defendant Martin represented that HWT's financial statements reflected "in all material respects the assets, liabilities, financial position, results of operations and cash flows of it on an accrual basis." See Exhibit 3, Contract, section 4.5(b).

15. Under the Contract, Defendant Martin represented that, "there has not been any Material Adverse Effect and no event has occurred or circumstance exists that reasonably could result in any such Material Adverse Effect." *See* Exhibit 3, Contract, section 4.6.

16. Under the Contract, Defendant Martin warranted and represented that he had not agreed or committed to modify the terms of any existing employment contract or granted any increase in compensation of any employees or adopted or amended or modified any employee benefit. *See* Exhibit 3, Contract, section 4.6(l)(s).

17. Under the Contract, Defendant Martin warranted and represented that he had not agreed or committed to suffering any loss of any material customer, distribution channel, sales location or sources of supply of raw materials, inventory, utilities or contract services. *See* Exhibit 3, Contract, section 4.6(o)(s).

18. Under the Contract, Defendant Martin represented that HWT had "maintained positive business relationships consistent with past practices with its business partners, vendors, suppliers, and all others (collectively, the 'Business

Associates') necessary for the operation of the Business of the Company." *See* Exhibit 3, Contract, section 4.10.

19. Under the Contract, Defendant Martin represented that neither HWT nor Defendant Martin "is aware of any pending problems, issues, or concerns with relationships with any of the Company's Business Associates." *See Id.*

20. Under the Contract, Defendant Martin represented that HWT's contractual agreements with employees, customers and Business Associates were "legal, valid, binding, enforceable, in full force and effect and will continue to be so on identical terms as of the Closing Date." *See* Exhibit 3, Contract, section 4.11(b).

21. Under the Contract, Defendant Martin represented that Defendant Martin had provided complete records of the terms of employment of all existing employees and independent contractors of HWT. *See* Exhibit 3, Contract, section 4.18.

22. Under the Contract, Defendant Martin warranted and represented that Defendant Martin had provided a list of HWT's five largest customers and further warranted and represented that "no event has occurred and no condition or circumstance exists that reasonably be expected to materially and adversely affect the relations of the Company with any Major Customer or any supplier." *See* Exhibit 3, Contract, section 4.20(a).

23. The Contract closed and Alpine 4 consummated its initial obligations to purchase HWT from Defendant Martin. As a result, HWT became a wholly owned subsidiary of Alpine 4.

24. On April 24, 2017, Defendant Huffacker called HWT's president, Terry Protto, and informed Mr. Protto that Defendant Huffacker was giving two weeks' notice of his intention to terminate his employment with HWT.

25. In the same conversation, Defendant Huffacker also informed HWT's president that Defendant Huffacker was taking HWT's best customer, Bravo Natural Resources, LLC ("BNR").

26. In the same conversation, Defendant Huffacker informed Mr. Protto that Defendant Huffacker was taking all water transfer employees with Defendant Huffacker in his imminent departure because, Defendants Huffacker rationalized, employees of HWT working under Defendant Huffacker's supervisions only received paychecks from HWT but that they really work for Defendant Huffacker.

27. On April 25, 2017, Terry Protto, president of HWT, followed up with contact with Defendant Huffacker inquiring as to the status of HWT's equipment in the field and presently servicing active oil drilling, well and extraction operations. In response, Defendant Huffacker falsely represented that rented equipment in the field would be returned and that it would take a week to gather and transport other HWT equipment in the field and in operation.

28. On April 27, 2017, Terry Protto, president of HWT, contacted BNR to inquire on the status of jobs HWT was then performing. Specifically, Mr. Protto inquired about jobs named Buford2X, Pickle, Rose, Johnson, Percal and CalTurner (collectively, "BNR Jobs").

29. Mr. Protto was informed by BNR, through its field operations manager, James Kielbarth, that BNR had hired a different vendor for the services, which referred to Defendant Huffacker and/or affiliates of his.

30. Before the foregoing events and unbeknownst to Alpine 4, on March 29, 2017, Defendant Belcher along with Chad Roberson organized an entity, RapidWater Resources, LLC as an Oklahoma limited liability company ("RWR") Mr. Roberson later disclosed and signed an affidavit that he had no knowledge of Defendants Belcher's and Huffacker's theft of HWT equipment or labor.

31. Upon information and belief, Defendant Belcher organized RWR to serve as a destination for Defendant Huffacker and the business of HWT that Defendant Huffacker was preparing to steal from HWT.

32. On May 4, 2017, HWT reported that over $250,000 worth of HWT's equipment had been stolen or removed from field locations.

33. Upon information and belief, HWT equipment was stolen by Defendants Huffacker and Belcher for use in RWR's operations which were to service the business of BNR stolen from HWT.

34. On May 31, 2017, in an effort to salvage HWT's lost business, Alpine 4 caused articles of amendment to be filed with the Oklahoma Secretary of State's office to change the name of HWT to Venture West Energy Services, LLC ("VWES").

35. From May 2017 through February 2019, Alpine 4 invested and re-invested time, energy, resources, capital and debt into attempting to restore VWES to the financial condition, customer base, employee and labor force that was warranted and represented by Defendant Martin to continue before and after Alpine 4's purchase of HWT.

36. On March 4, 2019, Alpine 4 had no choice but to cause VWES to file voluntary chapter 7 bankruptcy in the United States Bankruptcy Court for the Western District of Oklahoma (case no. 19-10727) ("VWES Bankruptcy").

37. In the VWES Bankruptcy, VWES' secured creditor and landlord obtained stay relief, thereby stripping VWES of all of its remaining assets.

38. In the VWES Bankruptcy, no property or assets were liquidated for the benefit of VWES's unsecured creditors. Essentially, Alpine 4 was compelled to abandon VWES as an asset in its portfolio and let VWES's secured creditors have all collateral remaining in VWES' possession.

39. In spite of these events, Defendant Martin has steadfastly maintained a right to compensation on a continuing basis under the payment terms of the Contract.

40. Upon information and belief, before agreeing to sell HWT to Alpine 4, Defendant Martin promised to sell or transfer the water transfer aspect of HWT's business to Defendant Huffacker.

41. Upon information and belief, Defendant Martin's sale of HWT to Alpine 4 motivated Defendant Huffacker to steal HWT's business and transfer it to a newly formed business with Defendant Belcher, RWR.

42. Upon information and belief, Defendant Martin knew that Defendant Huffacker's interpersonal relationships with BNR posed a risk that Defendant Huffacker could terminate his employment, steal the business, and essentially render HWT insolvent and incapable of supplying Alpine 4 with adequate revenue and resources to pay Alpine 4's obligations to Defendant Martin.

43. During the time between April 2017 and February 2019, Alpine 4 did not and could not know whether and to what extent the conduct of Defendants Huffacker and Belcher would prevent HWT/VWES from being able to turn around its business. Alpine 4 did not and could not know reasonably know, through reasonable investigation, all of the facts forming the basis for liability and damages of Defendants Huffacker and Belcher, while Alpine 4 was attempting to turn VWES around.

### FIRST CLAIM FOR RELIEF: BREACH OF CONTRACT – Defendant Martin

44. Alpine 4 incorporates by reference all prior allegations as though fully set forth in this claim for relief.

45. Defendant Martin breached the warranties and representations of the Contract by failing to disclose the strong possibility and eventual certainty that Defendant Huffacker, a key employee, was at risk of leaving HWT and stealing

ClarkHill\J9629\411864\260573363.v2-8/26/20        7

HWT assets, including HWT business, HWT employees, and forming or working with another water transfer vendor.

46. The Contract includes a term requiring application of Arizona law to its interpretation and enforcement.

47. Under Arizona law, a covenant of good faith and fair dealing is implied in every contract.

48. In all of the foregoing, Defendant Martin has breached the letter and spirit of the Contract as well as the implied covenant of good faith and fair dealing.

49. As a direct and proximate result of Defendant Martin's breaches, Alpine 4 has been damaged in the form of the valuable consideration deliverable under the Contract to Defendant Martin.

50. Due to the precedent breaches by Defendant Martin on the Contract, Alpine 4 should be excused and discharged from all further payment and performance obligations under the Contract.

51. The Contract includes an attorney fee clause for attorneys' fees incurred to enforce provisions of the Contract. *See* Exhibit 3, Contract, section 10.16.

52. Because this action arises out of contract, express or implied, pursuant to A.R.S. §§ 12-341.01 and 12-341, Alpine 4 is entitled to an award of its costs and attorneys' fees incurred in the filing and prosecution of this action to judgment.

**SECOND CLAIM FOR RELIEF: Interference with Business Expectancy – Defendants Huffacker and Belcher**

53. Alpine 4 incorporates by reference all prior allegations as though fully set forth in this claim for relief.

54. Defendants Huffacker and Belcher knew that HWT and its parent, Alpine 4, had an expectancy of continued business between HWT and BNR, as well as other HWT customers.

ClarkHill\J9629\411864\260573363.v2-8/26/20         8

55. Defendants Huffacker and Belcher acted improperly and illegally in stealing business of HWT from Alpine 4 and taking it for themselves in a competing business entity, RWR.

56. Defendants Huffacker and Belcher interfered with the business expectancy between HWT and its customers, particularly BNR.

57. Defendants Huffacker and Belcher acted knowingly, intentionally, and in bad faith to deny Alpine 4 and HWT the benefit of its bargain, specifically, the benefit of their business relationship with BNR.

58. Defendants Huffacker's and Belcher's directly and proximately caused Alpine 4 damages in the for of lost business, lost good will, and loss of business reputation, to such an extent that HWT/VWES was sent into a downward spiral from which it could not recover.

### THIRD CLAIM FOR RELIEF: Tortious Interference with Contract – Defendants Huffacker and Belcher

59. Alpine 4 incorporates by reference all prior allegations as though fully set forth in this claim for relief.

60. Defendants Huffacker and Belcher knew of Alpine 4's acquisition of HWT and the necessity that HWT continue to operate as a successful going concern, as HWT had from 2012 to 2015, in order for Alpine 4 to meet its payment and performance obligations under the Contract.

61. Defendants Huffacker and Belcher intentionally crippled HWT's and Alpine 4's ability to perform the Contract with Defendant Martin.

62. Defendants Huffacker and Belcher acted improperly in interfering with Alpine 4's Contract with Defendant Martin.

63. As a direct result of Defendant Huffacker's and Belcher's conduct, HWT became unable to operate solvently to an extent required to service the financial obligations of Alpine 4 under the Contract.

64. In both regards, Defendants Huffacker and Belcher interfered with the ability of Alpine 4 to perform its obligations to Defendant Martin.

65. Defendants Huffacker and Belcher acted knowingly, intentionally, and in bad faith to deny Alpine 4 and HWT the benefit of its bargain, specifically, to acquire a functional, solvent, and successful business capable of servicing the debt obligations internally and externally to Defendant Martin.

WHEREFORE, Alpine 4 prays for entry of judgment on its complaint as follows:

A. On its first claim for relief,

1) An award of judgment for all consideration paid, furnished and delivered under the Contract from Alpine 4 to Defendant Martin, together with interest on such sums at the highest legal rate permitted by law;

2) An order finding and declaring that Alpine 4 is excused and discharged from further performance of the Contract, together with a permanent injunction precluding enforcement of the Contract by Defendant Martin, his successors, devisees, and assigns.

3) An award of attorneys' fees and costs in a reasonable sum, together with interest on such sums at the highest legal rate permitted by law.

B. On its second claim for relief,

1) All compensable, special, consequential, and other damages caused and incurred by Alpine 4 as a direct result of the tortious interference with business expectancy committed by Defendants Huffacker and Belcher, together with interest on such sums at the highest legal rate permitted by law.

2) An award of costs, together with interest on such sums at the highest legal rate permitted by law.

C. On its third claim for relief,

1) All compensable, special, consequential, and other damages caused and incurred by Alpine 4 as a direct result of the tortious interference with

contract committed by Defendants Huffacker and Belcher, together with interest on such sums at the highest legal rate permitted by law.

   2) An award of costs, together with interest on such sums at the highest legal rate permitted by law.

 D. For such other and further relief as the court deems just and equitable in the circumstances.

 **DATED** this 26 day of August, 2020.

           **CLARK HILL PLC**

          By:/s/ Ryan J. Lorenz
          Ryan J. Lorenz
          *Attorneys for Plaintiff Alpine 4 Technologies Ltd.*